Case number 20-1058, Western Coal Traffic League petitioner versus Surface Transportation Board and United States of America. Mr. Slover for the petitioner, Mr. Light for the respondents. Mr. Slover, please proceed when you're ready. May it please the court, my name is William Slover and I'm appearing here this morning on behalf of the Western Coal Traffic League. Traffic League is a voluntary association of electric companies which pay the railroad hundreds of millions of dollars each year for transportation services. Before I turn to my contention that the Surface Transportation Board has made a decision which enables the railroad industry to overcharge my clients millions of dollars, I'd like to address the the court raised in its recent orders, namely the questions of mootness and redressability. As the court noted in the recent American Fuels case, an STB case can become moot or an intervening event makes it impossible for the court to award the relief that the petitioner requests. The event that the court noted was a letter from the Surface Transportation Board indicating that its membership had been expanded by two new members. The fact that the board has now five members as opposed to three or two or one as it has in the past, the board's membership has over the years been a continuously changing dynamic, does not affect the mootness rule and we do not see the addition of these new members making our case moot. The redressability question is addressed at page 21 of our brief. Redressability is an element of standing and it essentially requires or dictates that the court, that a successful decision or a winning decision from the court will redress the injury that we're complaining about. Here again, the injury that we're complaining about, namely the failure of the board to issue a rule eliminating its so-called safe harbor practice will definitely solve the injury that we're complaining about. As to both mootness and redressability, we don't see them impacting our petition. Suppose Congress had passed a new law last week or a month ago setting up the agency run by a single individual. Would the case be moot? No, because actually there's a law on the books, your honor, that says that the agency, the work of the agency cannot be impacted by vacancies and it was, the law came about because for many years there was only one member of this agency. So, I do not see that that would impact the question of mootness. You don't think it would be moot if Congress passed a new law saying this agency will be run by an individual? You mean by one board member? One person. Whatever it is. No, I don't. I don't think it would be moot. Well, that's an interesting question, but as I say, I don't see how it would moot our claim. Now, in terms of redressability, we have in a prior case remanded back to an agency when they were deadlocked to explain the positions to indicate there was a deadlock, but in this case they've already done that, haven't they? What else can we do as a court? Well, that of course is the basis of the argument that I will get to, namely the decision of the board we contend is arbitrary and capricious because it failed to the relevant facts, any of the information adduced by the public. That's going to, I guess, the merits of your case. I'm just talking about redressability. What kind of order do you visualize this court could give that would give you relief? Well, we would analogize our situation to the situation which the court dealt with in the radio and TV case. Yes, that's the case I was just talking about. Right, where it remanded the case to the Federal Communications Commission with instructions to provide reasoning and analysis that comported with the Administrative Procedure Act. That's what's from the three members indicating the three different positions, and why? Well, they have three positions, but their basic position, which is before the court, was they're unable to form a majority. There are individual reasons. Some of them are wildly misplaced, but they are really not part of the decision as we understand it. But my point is they've done what we once before remanded to get them to do in the radio television case. Pardon, I missed the first part. I'm sorry. They've already done what we remanded. I respectfully disagree. What they set out to do was determine whether overcharging for fuel was an aberration or an ongoing thing. They made no effort to consider any of that. They failed to consider any of the evidence, any of the submissions by the parties that had they done that, it's very probable that they would have come up with a rule. As I read the three positions, at least two of them would have come out, even if they thought that was an aberration, they still would have disagreed as to what to do. So it looks to me that the aberration is just a question. It's not a major issue because they were still in disagreement. Well, I certainly don't agree with you, your honor, that it's a subordinate issue because it's what the entire case was about. If in fact, the railroads were not overcharging on a regular basis, then there would have been no need to issue a rulemaking. So the focus of the proceeding, the very reason the proceeding was instituted, was to determine whether continual overcharging was a phenomenon or something that happened all the time. And this was never taken up. You go back to the mootness. Would it be fair to say it's at this point, wholly speculative as to whether there would be a deadlock with five members? A little hard. I think that they deadlocked with three. They could have been three, zero to one. So giving them two more members, I believe it would be speculative. Yes. Well, if it's speculative, then it's moot, isn't it? I don't know. I don't. I see that if the court were to remand the case with instructions to- I thought whether it's speculative goes to standing, not to mootness, but am I misunderstanding? Speculative goes to redressability, right? Is that typically how it's thought of? If it's wholly speculative, then there's no standing. Right. Well, I would think to my esteemed colleague that speculative would be also relevant to moot, because it's a likelihood of an incident recurring. And if it's wholly speculative of whether an incident would recur, it would still be moot. You'd have to have some likelihood of the issue would recur. Yes. If we're talking about the capable of repetition idea of mootness. That's what I'm talking about. Mm-hmm. Well, my time is very brief, but as I say, given the nature of the decision we're appealing, my argument is very brief. And that is that the board has rules and regulations on fuel surcharges, and they've been controversial. And they have provided that a charge that includes an element of profit is an unreasonable practice. On the other hand, they also have a rule that says if the charges are calculated using a index published by the Department of Energy, then they are immune from under their so-called safe harbor provision. And a major agricultural shipper challenged the fuel surcharge, demonstrated to the board that the railroads were charging $181 million more than their fuel costs on agricultural products. The board agreed with that conclusion, but it also found that the charge was lawful because it was computed using the public index. Can I follow up on one question that Judge Seligman asked about, and this goes to redressability rather than mootness for these purposes. Right. If the board tells us that it's deadlocked and we have statements that indicate that the board, the individual members gave consideration to what was presented to them, but at the end of the day, they're deadlocked, then it's unclear to me what we're supposed to do because the board has already told us it's deadlocked. And so if we do something and send it back, we're sending it back to a deadlock. Well, that obviously has not been sufficiently clear. Our view is that if the board had performed in accordance with its duties under the Administrative Procedure Act, it would have found from this evidence that the railroads were continually overcharging for fuel. They made no effort to review the evidence. If they had reviewed the evidence, they could not have been deadlocked because their own rules make it unlawful to overcharge for fuel. So our position is very simple. Had they rolled up their sleeves, reviewed the evidence, given consideration to the public comments, which showed thousands of pages of evidence and documents illustrating the overcharging, then they would not have ended up deadlocked. So your position is that this case is like radio television in the sense that the board identified something that appeared to be a serious problem, which is that even though it had blessed this safe harbor use of an index, nonetheless, railroads were able to significantly, to the tune of hundreds of millions of dollars, overcharge for fuel. And that the board acknowledged that that was a problem, wanted to see whether it was a pervasive problem because if it was, then that would you know, justify and necessitate a rulemaking. But that they didn't even kind of get the first base or even do kind of the preliminary work needed because it didn't even answer that question. It didn't even answer the question as to whether this was a pervasive problem. And if they had answered the question, then that might have spurred them to work harder to try to come up with a solution. Is that your basic argument? That is better stated than I could have stated it, Judge Wilkins. Thank you. Okay. My colleagues don't have, well, let me make sure my colleagues don't have further questions for you at this time. And if not, we'll hear from, we'll hear from the board. Thank you, Mr. Light. May it please the court, Eric Light, attorney for the surface transportation board here on today. I plan to address the two issues that were the subject of this court's recent orders, mootness and redressability. As to mootness, now that the board is up to five members, it would appear that the case is moot essentially. This court has said that a case is moot when no matter how the court rules, it cannot affect the rights of the parties. And that seems to be the and file a new petition rule-making whatever, even if this court were to rule against the league, it could still get back before the board and raise the issue of the safe Harbor. But isn't, isn't the standard of review for the denial of a petition to initiate a rule-making more deferential than the standard of review that we have before us now? I don't think so, your honor, because what we have before you now is the denial of a determination of an advanced notice of proposed rule-making, which is a highly preliminary stage of the proceeding. And it doesn't seem like it would be that much different from the denial of a petition for rule-making. Well, the there's case law, the consumer Federation of America case among others that says that the standard of review that we have now is somewhere in between the, the deferential, the extremely deferential standard that we give to the denial of a petition to initiate a rule-making and the standard that's less deferential that we give when someone is, is challenging an actual rule-making that, that we're, what we have now is somewhat in between there. And so if you're saying that this is moot, because if you assume that that's correct for the purpose of this question, this hypothetical, then they're not in the same position. If they have to file a new petition, they're in a worse position, right? I think as the standard of review, you may be, you may be right on that. Your honor. Yes. And even apart from the standard or you wouldn't, wouldn't their position just be, look, we just want the advance. There's already an advanced notice of proposed rule-making on the books. We just want that to be completed. That's different from starting all over with a petition for a new, from ground zero with the petition for rule-making. What we want to do is just to have the ANPRM come to a conclusion. It's already started. There's already comments on the books. Those comments should be taken into, have been taken into account. So there's a difference between your point that they can always file a petition for rule-making and their point, which is that we want what's already been done to be brought to a close. There is that difference, your honor, but I'm not sure it's that much of a difference. You know, they basically want the board to rule on the question of the safe Harbor, whether or not it should propose the repeal of the safe Harbor or not. And it can get an answer to that question, either route. That's all, that's all the respondents are saying as to movements. As to the question of redress ability, much of what we said in our brief in terms of the reasonableness of the board's decision also applies in terms of the question of redress ability. Here, the league has failed to show that the board's decision not to propose the repeal of the safe Harbor would have changed anything that the three member board did. For example, the league does not claim that this court could have ordered the board to propose a repeal of the safe Harbor, nor is the league explained why a remand to consider the aberration issue would have changed any of the three board members' minds. And that was the league's burden. But even putting aside the fact that it doesn't carry that burden, if you just look at what three board members said, there's no reason to think that any one of them would have changed their mind if they had considered the aberration issue. But, but, but isn't it significant that none of the three said one way or the other, whether they believe that what happened, um, in the Cargill, um, case was an aberration or not? No, your honor, because if you look at what they did say, if you look at the statements of members, uh, Overman and Fuchs, um, these were two members who came on board, joined the board in 2019. That was long after the 2014 advanced notice was issued and became clear to them that they disagreed with a fundamental assumption on which the 2014 advanced notice is based. Unlike their predecessors, they did not, um, they did not assume the validity of the 20, 2007 fuel surcharges decision. Um, member Oberman thought that that case had been wrongly decided and member Fuchs thought that was likely, although he didn't want to actually, um, resolve that issue. So there's no reason to think that either of those two members would have been persuaded to change their mind by a ruling on the aberration issue. And the league doesn't explain why either one of them would have changed their mind. So for that reason, we believe that, um, it would be speculative to think that a remand would, would cause any different result in this case. Well, I guess I find it interesting that that would be the position that this agency would take. I mean, if, if, if an agency is supposed to undertake rational kind of review of um, ultimately result in a reasonable rate and the board, um, at least in one instance, and the board said, well, if this is the case consistently, this is a big problem that we need to do something about. And the board just sticks its head in the sand and refuses to even, um, make a finding one way or the other, whether it's a big problem, um, and then doesn't do anything. Um, um, says it can't really, um, agree on a course of action to take. Hasn't the board just kind of at least fundamentally failed kind of like, um, um, kind of agency one Oh one, because it's, it's, it's identified something that's a problem. It says, we want to try to figure out how widespread it is. And then just like ducks, the whole question and never even answers the question as to whether this is a widespread problem or not. No, your honor, because as I said, two of the board members thought that the eight that the rules on which the safe harbor was based may have been in that either were invalid or were likely to be invalid. And so whether or not there was a, a widespread problem in terms of the aberration in terms of the Cargill result, the kind of Cargill phenomenon that would simply be irrelevant to what those two members prefer to do. So that's, that's one issue. That's one problem. The other thing is that even if there, even if the Cargill result was not an aberration, there are other factors that would go into whether or not the board would repeal the safe harbor. And those are things that the board asked about in the advanced notice. Um, for example, in the advanced notice among the, among the various things that it asked the parties to comment on was whether or not there were problems with the safe harbor that were outweighed by the benefits. I understand all that, but I guess my point is, is that they might do something that might save people millions of dollars. And even if it's not specifically repealing the safe harbor, that's giving them some relief to their injury, which means redressability. Well, for example, your honor, if member Oberman prevailed, um, the 2007 fuel surcharge decision would have been reversed and railroads would be able to charge rate-based fuel surcharges. So it's not the case. It's not clear why, um, addressing the outcome. And member Fuchs was very similar, very much along the same lines. He was very concerned about the validity of the 2007 fuel surcharge decision. Um, so again, it's not clear why the aberration issue would affect how he would want to come out. And again, it was the league's burden to show that, uh, that it was likely that the aberration issue, a resolution to aberration issue would have changed the outcome of the board's decision. I'm not saying... How does that square with, with what we've done in what we did in radio television and other cases where we granted, um, um, where we sent cases back where there was a denial of a petition to, um, we don't say that we're only doing this because we believe that, um, well, I guess, let me say it this way, for standing purposes, we assume that they went on the merits, right? Um, right. You would assume that there was, uh, that there was not an aberration. The cargo result was not an aberration. It was not an aberration and, um, but we also assume that they would do something with respect to, um, either getting rid of the safe harbor or making the burden on them higher than I think it should be for article three purposes that they somehow have to prove as part of the article three analysis that, that, that they would ultimately win, but we assume that they, they win for, for, for the standing analysis, don't we? No, for redressability, the burden is on, well here, the league to show that there would have been a different outcome, um, if the board had addressed the aberration issue. I think that's their burden and they haven't shown that it's likely that either of these two board members would have changed their mind and voted to propose the repeal of the safe harbor. So you think that we should hold that where an agency doesn't seek to identify something that's a problem, but then doesn't seek to determine what the extent of the problem and just says, um, you know, we, we can't agree on, on, on dealing with this. We should, um, find that um, it makes, it makes no difference or that the, that the petitioner has to show that, that if they had realized the extent of the problem, they would have, um, done something differently. Um, I don't think I worded that very well, but, but that, but that the determination of the extent of the problem kind of, um, doesn't necessarily have any, um, impact on whether they would have acted differently in trying to resolve the issue. No, no. I think it depends on the case. And usually, for example, on radio television, where an agency does identify a definite problem, then yes, the agency has to meaningfully address why it either thinks it is still a problem or is not a problem. Didn't they do that in Cargill? I mean, you know, we can look at the language in Cargill and there's a whole bunch of language in there about, you know, if, if this is, is indeed not an, an aberration, then we've got a problem. Right. Yeah. So that was the question. Is it an aberration? But the issue here is that two of the board members thought that the two board members who joined after the advanced notice fundamentally disagreed on whether or not the advanced notice was, well, they disagreed on a fundamental assumption on which the advanced notice was based, namely that the 2007 fuel surcharge rules were, were validly promulgated. And if that view were to prevail, then the whole aberration issue goes away. It's not, it doesn't matter because that's a fact-bound issue and resolving that fact-bound issue isn't going to affect how one views that legal question of the advance notice. What's the fact issue again? Because I thought the distinction that you were drawing in your brief, maybe I'm misunderstanding your argument. I thought the distinction that you were relying on was that in radio television, the agency operated on the premise that there was a problem. In this case, because it's an, it's a, it's an ANPRM as opposed to an NPRM, there's a predicate question as to whether there's a problem in the first place. And, and there wasn't a determination in radio television, part of what fueled the court's decision, including its decision that it made sense to send it back was that there, it was operating against the predicate that the agency had already said there was something to be fixed. Absolutely. Your honor, that's a difference. The agency said there was a problem. Um, the agency actually proposed something to do about it and instead just left that proposal out hanging. That's not the case here. And the agency actually in, in radio television set up for itself a particularly high burden to explain why it was not going, if it was not going to do something about that problem, why? And here again, the board did nothing along those lines. Um, there, the two cases are at different stages of the rulemaking proceeding. The boards here, the advanced notice is much earlier stage where we were trying to find out whether there was a, a problem that needed addressing in the first place. And what's the factual issue you were just talking about in response to judge Wilkins. I just want to make sure I understand that. The aberration issue is essentially a factual issue is the cargo type of phenomenon. Um, was that a widespread phenomenon or was it sort of a one-off that's a factual issue. And the resolution of that issue is not going to affect someone who thinks that, um, the fuel surcharge rules were inappropriate to begin with. Would you say two, two board members had already reached that conclusion or at least indicated in there? Right. Well, one certainly had, one certainly had, and the other indicated serious concerns along those lines. Serious concerns doesn't mean though that they believe that the decision was wrong. I guess my, my, here's my, my, my bottom line here is that the Cargill decision says that if this isn't an aberration, then we've got a problem. And that's why you have the advanced notice of proposed rulemaking. Do you agree with that? It said, yes, if there's a widespread problem, then we need to think about whether or not we're going to do something. Uh, what, what we may want to do about that, because even if it were widespread, there are other factors that may come into play as to why the board may want to either modify the safe harbor or retain it. Um, there are a number of factors that would go into play, come into play. But yet there was no undertaking to determine whether this was a widespread phenomenon. Agree? No finding. Correct. Okay. Let me make sure my colleagues don't have additional questions for you, Mr. Light. If not, we'll hear from Mr. Slover for his rebuttal. We'll give you two minutes. Thank you, Your Honor. I have only two points to make. One at page 27 of our brief, we, we deal with the question that Mr. Light has been dealing with in the Sullivan case, essentially saying that the commissioners don't believe in their own rules and regulations and decisions of the court require the board to enforce its own rules. And the fact that these two commissioners had misgivings about their own rules, uh, totally irrelevant. Our, our case comes down to this. If, as we demonstrated, the railroads are earning hundreds of millions of dollars in profit from charges intended only to get fuel costs returned, they are engaging in an unlawful practice. The board's rules, its decisions, its regulations say that a charge that includes a profit is unreasonable and unlawful. Had they found that as they had to with these thousands of pages of record, then they had no other choice but to issue a rule eliminating the safe harbor, which perpetuates and enables the overcharging. That's our case in a nutshell. Thank you. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Wilkins, Silberman